**UNITED STATES of America,**

v.

**Robert John MANBECK, Thomas Manbeck, Kenneth Herring, Gary Gallopo, Mark Huiet Sale, David Martin Summerville, Lorenz Josephus Proden, Kermit Theodore Brogden, John O'Hare, Eddie Brantley, Thomas Earnest Folske, Thomas Sams Hightower, Timothy Alan Laxton, Harrel Lewis, Jr., John Isidore Stevens, Aaron Douglas Staetter, John Michael Iyoob, James Anthony Hastings, John Benjamin Barton, Jr., John Wesley Flannel, Jessie Lee Mallory, Arthur Duncan, and Gregory Michael Scott.**

**Crim. No. 80–278.**

United States District Court,
D. South Carolina,
Charleston Division.

Nov. 24, 1981.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S. C., Cameron B. Littlejohn, Jr., Asst. U. S. Atty., Columbia, S. C., for plaintiff.

Mark Kadish, Rhonda A. Brofman, Kadish, Davis & Brofman, P. C., Atlanta, Ga., Gedney M. Howe, III, Howe & Howe, Charleston, S. C., for defendants Manbeck and Herring.

Michael L. Pritzker, Marcia L. Smith, Stroup, Goldstein, Jenkins & Pritzker, Chicago, Ill., Dennis E. O'Neill, Burkett, Guerard, Wooddy, Bargmann, Cisa & O'Neill, Mount Pleasant, S. C., for defendant Gallopo.

Edward Garland, Austin E. Catts, John R. Hesmer, Garland, Nuckolls & Catts, Atlanta, Ga., for defendants Sale and Proden.

Mark C. Tannenbaum, Charleston, S. C., for defendant Sale.

Gedney M. Howe, III, Howe & Howe, Charleston, S. C., for Proden and Brogden.

R. David Botts, Harper, Wiggins & Botts, Atlanta, Ga., Gedney M. Howe, III, Howe & Howe, Charleston, S. C., for Summerville.

Arthur G. Howe, Paul Uricchio, Barry Krell, Uricchio, Howe & Krell, P. A., Charleston, S. C., for defendants O'Hare, Brantley, Folske, Hightower, Lewis, Laxton and Stevens.

Edwin Marger, Diane Marger, Atlanta, Ga. and Peden B. McLeod, McLeod, Fraser & Unger, Walterboro, S. C., for defendants Staetter, Iyoob, Hastings and Scott.

Donald B. Walker, Atlanta, Ga., and Peden B. McLeod, McLeod, Fraser & Unger, Walterboro, S. C., for defendants Barton, Mallory and Duncan.

Robert G. Fierer, Steven Westby, Atlanta, Ga., and Peden B. McLeod, McLeod, Fraser & Unger, Walterboro, S. C., for defendant Flannel.

## ORDER

HAWKINS, District Judge.

### INTRODUCTION

This case is one of an increasing number of federal prosecutions brought against individuals charged with smuggling marijuana into states of the Fourth Circuit. South Carolina, like some other states in this circuit, is located along the Atlantic Seaboard. The state's coastline, with its many bays, rivers and inlets, provides drug smugglers with easy access to the ocean for the smuggling of marijuana into this country.

This case involves a multiple count indictment[1] against twenty-six defendants[2]

---

1. Count 1 of Indictment # 80–278 charges the defendants with conspiracy to import marijuana into the District of South Carolina. Count 2 charges defendants with conspiracy to possess marijuana with intent to distribute. Defendants are charged in Count 3 with importation of marijuana. The original indictment contained a fourth count for possession with intent to distribute which the government moved to dismiss as to all defendants except defendant Gallopo. Record, Vol. X–A, at 233. The government's motion was granted by this court's order filed May 11, 1981.

2. The original indictment named twenty-six individuals as defendants. This order considers the government's charges as to only twenty-two of the originally named defendants. Defendant Robert Charles Michael entered a plea

alleging various drug-related charges arising out of a drug smuggling operation which took place at Bennett's Point, South Carolina, in November 1980. On March 12, 1981, an extensive suppression hearing commenced in the case. Upon completion of the hearing and on April 1, 1981, all remaining defendants, with the exception of Robert John Manbeck and Gary Gallopo, pursuant to Rule 23(a) of the Federal Rules of Criminal Procedure,[3] waived their right in writing[4] to trial by jury and requested a trial before the court. The government consented to such a waiver. Record, Vol. VIII, at 42–90. Thereafter, the government and the defendants agreed to a stipulation adopting the record of the suppression hearing as the record of the case in chief, subject to any objections to be filed by the parties with the court. The trial of the defendant Gary Gallopo constituted the final segment of the proceedings. After these in-court proceedings, all parties filed with the court their objections and arguments as to the suppression hearing and as to the record stipulated as the record of the case in chief.

This order sets forth the rulings of the court as to defendants' motions to suppress, their objections to the record of the case in chief, and the guilt or innocence of the defendants. Two extensive orders have already been filed by the court in this case. On April 24, 1981, an order was filed denying defendants' motion to dismiss the indictments. That order was subsequently amended on June 17, 1981.[5] On May 12, 1981, this court filed another order denying

defendants' Speedy Trial motion and granting the government's motion to dismiss Count 4 of the indictment.[6]

## I. STATEMENT OF FACTS [7]

At approximately 8:45 p. m. on November 26, 1980, Deputy Harold Canady of the Colleton County Sheriff's Department received a telephone call from his office advising him that an unidentified person had called the local fire department and stated that a truck was being loaded with marijuana at Bennett's Point, South Carolina. Canady proceeded to Deputy Allen Beach's residence and there he informed Beach and Deputy Earl Fowler, who was also present, of the phone call. The three proceeded on to Bennett's Point, which is located on the South Carolina coast, and arrived at approximately 9:30 p. m. Canady and Beach went in one patrol car and Fowler drove his own car. Canady and Beach proceeded on to the landing, while Fowler checked some vehicles parked on the road leading to the landing. The weather on this evening was cold and rainy.

Upon arriving at Bennett's Point landing, Canady and Beach observed a tractor-trailer backed up between a shrimp house and the dock. Canady recorded the number of the Georgia license plate on the tractor-trailer. The two officers then observed a white "U–Haul type" truck parked in the parking lot at the landing. They then recorded its Georgia license plate number. A brown "econoline-type" van was also observed at the scene, parked facing the tractor-trailer behind the shrimp house. Cana-

of guilty on March 17, 1981. Defendants William Sidney Baldwin, Jr. and James Dais entered a plea of guilty on March 26, 1981. Defendant Robert John Manbeck remained a fugitive throughout all trial proceedings in this case.

**3.** Rule 23(a) of the Federal Rules of Criminal Procedure provides that "[c]ases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government."

**4.** The Rule 23(a) waiver was filed in writing with the court on April 1, 1981, and is a part of the record.

**5.** This order as amended is published at 514 F.Supp. 141 (D.S.C.1981).

**6.** This order is published at 514 F.Supp. 152 (D.S.C.1981).

**7.** This statement of facts is based on the entire record made during the suppression hearing. Any facts appearing herein which were set forth by testimony which is stricken in section III of this order are in no way considered by this court in determining the guilt or innocence of any defendant. Furthermore, any facts concerning defendant Gary Gallopo are set forth in section IV of this order.

dy also recorded the Georgia license plate number of this vehicle. In addition, the officers observed a shrimp boat named the "Hazel B" docked at the south dock. No individuals were observed in the area at this time.

After making these preliminary observations, Officers Canady and Beach left the area and conferred with Officer Fowler who had been waiting on the paved road leading into the dock area. Fowler subsequently maintained a surveillance point on Bennett's Point Road at the entrance to the landing. Canady and Beach went back down to the landing for further observations and then proceeded up Bennett's Point Road to a private residence to telephone the Sheriff of Colleton County.

Upon notifying Colleton County Sheriff John Seigler of their observations, Officers Canady and Beach proceeded to check out another known drug smuggling site referred to as the "Wiggins area." After finding nothing unusual there, the two officers went to a location known as "Brickyard Bridge" which was on the one road that runs from U. S. Highway 17 to Bennett's Point. Upon arriving at Brickyard Bridge, Officers Canady and Beach received a radio communication from Officer Fowler advising that the tractor-trailer had departed Bennett's Point landing. Thereafter, Sheriff Seigler radioed officers Canady and Beach and directed them to stop the tractor-trailer at the intersection of Bennett's Point Road and U. S. Highway 17.

Officers Canady and Beach proceeded down the road about one mile ahead of the tractor-trailer, while Officer Fowler followed the vehicle from behind. At the intersection of Bennett's Point Road and Highway 17, Officer Canady positioned his patrol car so as to block the road. When the tractor-trailer, a Peterbilt tractor with the name of Polar Transportation on its door, arrived, Officer Canady went to the driver's side and asked the driver to step out of the vehicle. The driver stepped out and, on request, showed his driver's license and registration. He also provided Officer Canady with a bill of lading which indicated that the tractor-trailer was carrying a load of lard from a Charleston business named "Central Soya." The driver was then asked to sit in the patrol car with the two officers because of the inclement weather conditions. Officer Canady then radioed Sheriff Seigler and provided him with an updated report of the situation and gave him the information from the bill of lading for him to check out. Meanwhile, Officers Canady and Beach elicited from the driver that he was at Bennett's Point visiting a friend. When asked where he was keeping his tractor-trailer truck parked, the driver's response conflicted with what the officers had previously observed at Bennett's Point. When asked about when he had left Charleston, the driver responded that he had left two days before but had become ill and stayed in a motel room for some time before proceeding to Bennett's Point. Sheriff Seigler subsequently radioed Officers Canady and Beach and informed them that he could not locate any company in Charleston with the name shown on the bill of lading provided by the driver.

Subsequently, Officer Fowler, who had arrived at the scene, requested Officer Canady and Officer Beach to get out of the patrol car and come to the back of the trailer. Upon approaching the rear of the trailer, the officers smelled an extremely strong odor of what they believed to be marijuana coming from the back of the trailer. Thereafter, the driver, defendant Kenneth Brogden, was placed under arrest for possession of marijuana and was then searched and handcuffed.

As the Peterbilt tractor and trailer were being removed from the scene, Officer Canady spotted a second tractor-trailer coming from Bennett's Point. As it approached, Canady observed that it bore Georgia license plates and carried the name of "Polar Transportation" on its door as had the first tractor-trailer; however, this tractor was a Ford. The tractor-trailer stopped and, as before, the odor of marijuana was detected coming from the trailer. Deputy Fowler immediately placed the driver of this second tractor-trailer, Donald Bohanon, under arrest.

Officer Canady, Deputy Beach, Deputy Fowler and others on the scene then proceeded to organize a convoy to move the seized vehicles and contraband to Walterboro. As the convoy proceeded toward Walterboro, Officer Robinson, who had remained at the scene of the arrest with Bohanon, radioed the convoy and requested them to stop moving. Robinson then informed the officers that Bohanon had told him of the presence of a third tractor-trailer at Bennett's Point landing. As Officers Canady and Beach turned around to head back to the landing area, they saw the two vehicles previously observed at the landing, the white "U–Haul type" truck and the brown van, stalled in traffic behind the tractor-trailer. Both vehicles were stopped by the officers. Officer Beach approached the white truck and requested the driver, David Summerville, who was the sole occupant of the truck, to step out of the truck and show his driver's license. As Summerville handed over his license, Officer Beach detected the odor of marijuana on him. Summerville was immediately placed under arrest. The two occupants of the brown van, defendant Mark Sale, who was driving the van, and defendant Lorenz Proden, who was a passenger, were also arrested.

Thereafter, Sheriff Seigler arrived on the scene and he and Officers Canady and Beach headed towards Bennett's Point landing. It was about 3:30 a. m. When the officers arrived at the landing, they found everything to be quiet. No vehicles were observed at the scene. Another shrimp trawler, the "Billy B," was now at the dock beside the "Hazel B." The three did observe what appeared to them to be lights coming from a vessel of some type out on the water. They could not determine whether the lights were coming toward the dock or going away.

Sheriff Seigler and Officers Canady and Beach then proceeded to check a wooded area nearby in search of the third tractor-trailer. After checking this area and finding nothing, the three made contact with an officer of the U. S. Customs Patrol. The Custom's officer was briefed as to what had occurred and made arrangements to proceed with a patrol of the waters around Bennett's Point.

After Canady, Beach and Seigler made checks of other areas, Officers Canady, Beach and Fowler proceeded to obtain search warrants for the four vehicles from Magistrate Richard Wood. While at Magistrate Wood's residence, the officers received a call from the dispatcher informing them that Customs had picked up a vessel. Deputies Beach and Fowler immediately left to assist Customs with the people aboard the vessel.

Customs Patrol Officers testified during the suppression hearing as to the developments which led to the arrest of the defendants found on board the two shrimp trawlers, the "Mary and John" and the "Lady Lisa."

Customs Patrol Officers had patrolled the St. Helena Sound area for two to three weeks prior to the evening of November 26th and had not observed any boats in the area. On the evening of November 26th, Customs Patrol Officer McDonald was apprised of the situation at Bennett's Point and, at approximately 3:00 a. m., he directed a Customs vessel to proceed down the Ashepoo River to see what could be located. Prior to sending this vessel out, Officer McDonald and others heard the sound of a diesel engine in the area of Bennett's Point which, according to McDonald, seemed to sound as if it was going out the Ashepoo. Thereafter, several Customs Patrol Officers left their location some twelve or thirteen miles from Bennett's Point in a twenty-seven foot Customs vessel. They headed for Bennett's Point at approximately 3:30 a. m. Upon reaching the end of the Ashepoo River, at approximately 4:00 a. m., they observed lights from what appeared to be two vessels in St. Helena Sound. The Customs Patrol approached and circled the anchored vessels, recorded their names, and ran a systems check on them. That check indicated that the vessels were suspected of involvement in drug smuggling.

The Customs Patrol Officers identified themselves and were given permission to

board the "Lady Lisa" by the captain after requesting the captain to prepare for a boarding. The spokesman told the Customs Patrol that he was from Thunderbolt, Georgia, and had eight people aboard. Because of the strong winds and high seas, the officers had great difficulty in pulling alongside the vessel. The Customs Patrol Officers decided not to board at that time for safety reasons and, upon their request the spokesman aboard the "Lady Lisa" agreed to follow the Customs vessel back into the Ashepoo to be boarded. The captain of the "Mary and John" informed Customs that he was coming from Charleston and going to St. Augustine with four people aboard. He also agreed to follow the Customs vessel into the Ashepoo and proceeded to follow behind the "Lady Lisa." As the Customs vessel led the two trawlers in, the officers observed that although the captain of the "Lady Lisa" had earlier stated he was not familiar with the waters, he headed for deeper water whenever the Customs vessel was running in shallow water. In addition, no shrimp nets were observed aboard the vessels when the vessels were initially approached.

The vessels were taken on in to the dock at Bennett's Point at approximately 6:30 a. m. Customs Patrol Officers, officers from the Colleton County Sheriff's Department and S.L.E.D. agents were at the dock and secured the boats. Customs Patrol Officers Shephard and McDonald boarded the "Mary and John" and discovered that nine people were aboard instead of the expected four. In addition, the vessel was now completely rigged with shrimp nets. Upon entering the fishhold of the vessel, they observed what appeared to be marijuana residue. The crew members of the vessel were then given their Miranda rights and placed under arrest. The time was approximately 7:00 a. m. Those arrested aboard the "Mary and John" were John Wesley Flannel, Arthur Duncan, Jesse Mallory, John Benjamin Barton, Jr., James Anthony Hastings, Gregory Michael Scott, Aaron Douglas Staetter, John Michael Iyoob and Robert Charles Michael.

Customs Patrol Officers Settles and Sheriden boarded the "Lady Lisa" and gathered the crew in the cabin. Settles observed that the deck appeared to have been recently hosed down. He then climbed down into the fishhold and smelled and observed residue of what he believed to be marijuana. He also noticed the absence of any fish or ice on the vessel. The men aboard the "Lady Lisa," Thomas S. Hightower, John Isidore Stevens, Harrel Lewis, Jr., Timothy Alan Laxton, Thomas Earnest Folske, Eddie Brantley and John O'Hare, were given their *Miranda* rights and placed under arrest.

On the dock itself, investigating officers found bales of marijuana on the concrete and conveyor belts. The bales of marijuana had tags attached to them, and one of the same type tag was found in plain view on the deck of the "Lady Lisa."

On November 27, 1980, warrants signed by Magistrate Richard Wood to search the Peterbilt tractor and trailer, the Ford tractor and trailer, the white "U–Haul type" van and the brown van were executed under the direction of Sheriff Seigler. A large number of bales of marijuana were discovered in each of the trailers being pulled by the Peterbilt and Ford tractors and in the "U–Haul type" truck. The total amount of marijuana found in these three vehicles was later calculated to be 59,100 pounds. Government Exhibit No. 9 (case in chief). In addition, numerous items were discovered in the brown van, including a wallet containing identification of defendant Staetter and a red pad containing numerous notations.

One final episode at issue in this case should be set forth. On November 28th, at 5:30 p. m., Officer William E. Youmans of the Hampton County Sheriff's Department had an abandoned vehicle towed to the Hampton County Jail to avoid the possibility of its being vandalized. Officer Youmans had kept the vehicle under observation since its discovery at a public landing on the evening of November 26th. The vehicle, a brown 1981 Chevrolet station wagon, bore a Florida license tag and con-

tained a suitcase and a coat. The Sheriff's Department ascertained the owner of the vehicle to be a leasing company in Orlando, Florida. That company notified the Department of its intention to have the car picked up in a few days.

Deputy Youmans informed S.L.E.D. Agent Vick Deer of the abandoned vehicle because Youmans had some suspicions concerning its connection with the Bennett's' Point smuggling case. Thereafter, Deputy Freeman and Lieutenant Deer performed a warrantless search of the car and recovered personal effects of defendants Scott and Hastings. A motel receipt, the lease agreement for the car, and a vehicle transfer form with defendant Iyoob's name on it were also recovered. All items were subsequently turned over to S.L.E.D. Agent Keel.

## II. MOTIONS TO SUPPRESS

All defendants, with the exception of defendant Gallopo,[8] moved this court to suppress all evidence discovered as the result of the search and seizure of the two tractor-trailers, the brown Ford van, the white "U–Haul type" truck, the "Mary and John", the "Lady Lisa" and the abandoned Chevrolet vehicle. Moreover, defendants moved to suppress all evidence obtained as the result of the seizure of arrest of the individual defendants, including their identification, their physical description and any statements made by them.

### A. *Standing*

■ In considering these defendants' motions to suppress, this court must pursue a two-step inquiry. It must first be determined whether the defendant has satisfied the standing requirement as set forth by the United States Supreme Court. Pursuant to this requirement, the exclusionary rule is available only to defendants whose own rights have been violated by an illegal search and seizure. *See, Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980). The United States Supreme Court in *Rakas v. Illinois*, 439 U.S.

128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), made the touchstone of the standing inquiry to be the defendant's "legitimate expectation of privacy" in the area searched. *See, Rakas*, 439 U.S. at 139–40, 99 S.Ct. at 428. Thus, the defendants bear the burden of proving not only that the search and seizure was illegal, but also that they had a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Defendants made no serious attack on the actual search warrants issued for the vehicles, and this court finds them to have been sufficient. Thus, defendants' primary arguments focused on their expectations of privacy and on the illegality of the searches and seizure of the vehicles and vessels involved in the smuggling operation.

■ (1) *Two Tractor-Trailers.* According to defendant Brogden's testimony, he was requested by Robert Manbeck to drive the Peterbilt tractor and trailer loaded with marijuana from Bennett's Point to Atlanta. In return for his efforts, Brogden was to receive a part of the profits upon the sale of the marijuana. Brogden testified that he did not know who actually owned the vehicle. The government took the position that only Brogden had standing to contest the legality of the seizure of the truck which he was driving and its contents. After hearing arguments in support of standing for the remaining defendants, it was the ruling of this court that defendants Herring, Proden, Summerville and Sale would also be granted standing to move to suppress the evidence obtained as the result of the seizure of the Peterbilt tractor and trailer. A sufficient showing was made as to their interest in the marijuana seized so as to warrant the finding that they had a reasonable expectation of privacy in the Peterbilt tractor and trailer and its contents. Defendants Brogden and Sale testified that they, and Robert Manbeck, had an undivided possessory interest in the profits to be made from the sale of the marijuana. According to Brogden, only the partners in

---

**8.** See section IV.

interest had any right to enter the truck. Defendant Sale testified to the following: "Mr. Manbeck loaned [the truck] to Mr. Brogden. In essence, I guess he really loaned it to all of us, we all had an interest in it." Record, Vol. IX, at 199. While this court was not persuaded by certain segments of this testimony, it choose to assume during the hearing that these five named defendants had standing to contest this search and seizure. Record, Vol. IX, at 234–35.

After this court so ruled from the bench, the Fourth Circuit decided the case of *United States v. Dickerson*, 655 F.2d 559 (4th Cir. 1981). There the court ruled that where the government had produced evidence showing that someone other than the defendant owned a plane, the defendant would be required to produce some evidence that he possessed an interest in the owner-company or that he flew the plane with permission of the owner. The court ruled that in the absence of such evidence, the district court could properly infer that the defendant's possession of the plane was not "legitimate." *Id.* at 561.

Upon consideration of this recent pronouncement by the Fourth Circuit, this court chooses to leave as stated its determination that these defendants have standing to object to the search and seizure of the Peterbilt tractor and trailer.

■ As for standing to object to the search and seizure of the Ford tractor and trailer and its contents, it is the ruling of this court that none of the named defendants have standing to object to its search and seizure. The Ford tractor and trailer was driven by Bohanon, who later became the government's witness and who testified that he consented to its search. The record is void of any evidence presented to establish a legitimate expectation of privacy on the part of any of the named defendants. *See, Dickerson* at 561.

(2) *Brown Van.* The brown van which was driven by defendant Sale and in which defendant Proden rode was seized and later searched pursuant to a search warrant. The van was apparently registered in the

name of Robert John Manbeck and loaned to Sale. The warrant search resulted in the discovery of some personal items, including clothes and toiletries, and a red pad containing various names, phone numbers and radio communication information. Only the pad and a wallet containing defendant Staetter's driver's license were introduced into evidence by the government. All defendants claimed standing to raise the issue of the unlawful search and seizure of the van and the arrest of its two occupants.

■ Defendant Sale, the driver of the van, testified at the suppression hearing as to his expectation of privacy in the van and its contents. He testified that the loaned van was solely in his control and that he had possession of the keys to the van and allowed only people into the van which he chose to let in. It is the opinion of this court that defendant Sale has asserted the requisite interest in the van and its contents to warrant a finding that he had a legitimate expectation of privacy in the van and its contents so as to allow him standing to contest its search and seizure. *See, Dickerson* at 561.

■ Defendant Proden was merely a passenger in the van and made no showing to the court of any interest in the van so as to warrant a finding that he held a legitimate expectation of privacy in the van. It is, moreover, the finding of this court that neither defendant Staetter nor any of the other defendants have standing to object to any actions taken by any law enforcement officials as to the brown van.

(3) *White "U–Haul Type" Truck.* The white "U–Haul type" truck was driven by defendant Summerville and seized and later searched by Lieutenant Deer and Officer Garcia pursuant to a search warrant. No exhibits obtained from this search were introduced into evidence during the suppression hearing. Standing is sought by all defendants to contest the seizure of the truck, the arrest of defendant Summerville, the validity of the search warrant used to search the vehicle, and any evidence resulting from such search and seizure.

■ The record is rather limited as to the facts surrounding the involvement of this truck in the operation. Defendant Summerville did not testify at the suppression hearing, even though he might have done so without prejudice to his rights at trial. It is unclear who owned or leased the truck for its participation in the operation. While it might appear that defendant Summerville's presence in the truck was legitimate in the sense that he was in the truck with the permission of its owner, whoever the owner was, that finding is not determinative of whether he had a legitimate expectation of privacy in the truck. *See, Rakas,* 439 U.S. at 148, 99 S.Ct. at 433; *Dickerson,* at 561. Therefore, it is the conclusion of this court that neither Summerville nor any of the other defendants have standing to contest the search and seizure of the white "U–Haul type" truck.

(4) *Abandoned Vehicle.* During the suppression hearing, the government introduced into evidence certain items taken from the abandoned Chevrolet vehicle discovered by Deputy Youmans. At the end of these proceedings, the government chose to withdraw all but one of these exhibits. The only exhibit remaining in evidence was the lease for the vehicle. The lease was in the name of defendant James Hastings. Record, Vol. VII, at 852–853. The record indicates that defendants' attorneys and the government entered into a stipulation whereby it was agreed that only defendant James Hastings would have standing to argue the issue of the suppression of the lease. The court agreed to the stipulation. Record, Vol. VII at 853. Thus, no additional standing issues in this regard remain to be considered.

(5) *Two Shrimp-Trawlers, "Mary and John" and "Lady Lisa".* As for the search and seizure of the two shrimp trawlers, this court looks to the Fourth Circuit pronouncement in *United States v. Coats,* 611 F.2d 37 (4th Cir. 1979) and in the recent *Dickerson* case. Pursuant to these cases and the testimony of defendants Hightower and Flannel, it is the conclusion of this court that only defendants Hightower and Flannel have shown a legitimate expectation of privacy in the vessels so as to grant them standing to contest the validity of their search and seizure. The court in *Coats* said:

> In *Rakas v. Illinois* (1978) 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387, the Supreme Court declared that only one who has a legitimate expectancy of privacy in property may object to a search of such property, and, while the expectation need not rest on common-law property concepts, such property rights may often be determinative of whether a party has such expectation of privacy as to support his objection to a property search under the Fourth Amendment.

*Id.* at 39, 40. This same approach would apply to contesting the seizure of the vessel and any of its contents.

■ Defendant Flannel testified that he was captain of and owned the "Mary and John." In light of *Coats,* he has made a sufficient showing to sustain his claim to privacy, but only as to those areas not accessible to those legitimately aboard the vessel. Thus, he could not claim any legitimate expectation of privacy in the fishhold of the vessel or in the deck area. *See, United States v. DeWeese,* 632 F.2d 1267 (5th Cir. 1980).

■ Defendant Hightower testified that while he did not own the "Lady Lisa," he served as its captain and as such he had the right to determine who was allowed on board. He asserted a sufficient protectable interest in the "Lady Lisa" to allow him standing to contest the search and seizure of that vessel. His claim of privacy, however, is subject to the same limitation placed upon defendant Flannel's interest in the "Mary and John."

B. *The Legality of the Searches and Seizures*

Having determined what legitimate expectations of privacy are present in this case, it becomes the duty of this court to determine the legality of the searches and

seizures which occurred.[9] This court will consider the legality of the various searches and seizures irrespective of its pronouncement as to standing issues.

■ (1) *The Peterbilt Tractor and Trailer.* Clearly, the facts known to Officers Canady and Beach at the time they blocked the road and stopped the Peterbilt tractor and trailer justified their actions. Such a stopping of the tractor-trailer constituted a seizure within the meaning of the Fourth Amendment. *See, United States v. Cortez,* 449 U.S. 411, 415, 101 S.Ct. 690, 693, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *United States v. Tate,* 648 F.2d 939 (4th Cir. 1981).

> Under the Fourth Amendment, the validity of this investigatory stop depends upon a balancing of the intrusion on the defendant's Fourth Amendment rights against the prosecution of legitimate governmental interests sought to be accomplished by the actions of the ... [officers] .... The reasonableness standard imposed by the Fourth Amendment requires that the facts on which ... [the officers] based their decision to stop the ... vehicle "be capable of measurement against an 'objective standard.' "

*Tate,* at 941.

■ The objective circumstances observed by and known to the officers who seized the Peterbilt tractor and trailer rendered their suspicion that it was involved in illegal activity "articulable and reasonable." *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. The objective circumstances were the receipt of an anonymous tip that a truck was being loaded with marijuana at Bennett's Point; the subsequent observation of the tractor-trailer with Georgia license plates at Bennett's Point landing, along with two smaller vehicles also with Georgia plates; the movement of the tractor-trailer at night; the reputation of the area as a place used to smuggle illegal drugs, and the fact that the officers had never seen a tractor-trailer in the area before the night in question.

■ After detaining the driver, defendant Brogden, for a few minutes, the officers questioned him about certain matters. Defendant Brogden responded with either erroneous or highly questionable answers.[10] The officers obviously had to continue to detain defendant Brogden until it could be further determined whether or not he was telling the truth about the load he was hauling. *See generally, United States v. Jackson,* 652 F.2d 244, 250 (2d Cir. 1981). Subsequently, Sheriff Seigler radioed Officers Canady and Beach and informed them that he could not locate any company in Charleston with the name shown on the bill of lading provided by the driver. These developments served to elevate the officers' reasonable suspicions to the level of probable cause, and thus provided a foundation for a lawful arrest. The officers had probable cause to believe that a crime was being committed through the use of the vehicle. At least after the moment Sheriff Seigler radioed the officers back, it was reasonable for them to believe that Brogden possessed a vehicle containing contraband. *See generally, United States v. Jackson,* 652 F.2d 244, 250 (2d Cir. 1981); *United States v. Leazar,* 450 F.2d 982, 984 (9th Cir. 1972). In coming to this conclusion, this court is

---

**9.** That portion of the record developed by the defendants to establish their expectation of privacy in the various vessels and vehicles involved in this case was considered by this court solely for the limited purpose of determining the standing issues presented. This includes testimony found at Volume IX, page 197–207, 236–249, and Volume X, pages 24–40, 131–157. *See, Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968).

**10.** Officer Canady testified during the suppression hearing as follows:

> We asked him where his truck was parked, and he told us where he had his truck parked, which was not where we had observed the truck. We asked him when he loaded out of Charleston, and he told us a couple of days before is when he actually loaded, and we asked him why it took him two days to get there, and he said he had been sick at a motel room.

Record, Vol. I, at 41.

guided by the United States Supreme Court's recognition that "[i]n dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

This court concludes that this case is distinguishable from the very recent case of *Sharpe v. United States*, 660 F.2d 967 (4th Cir. Sept. 4, 1981). In *Sharpe*, the Fourth Circuit held that an investigatory stop which lasted for fifteen minutes before an arrest was made was effectively, by the length of the detention, a de facto arrest, and as such, probable cause was required. Here, the record does show that defendant Brogden was probably detained for forty-five minutes to an hour, before he was actually placed under arrest. Record, Vol. I, at 102–103, Vol. II, at 161–162. However, contrary to the situation in *Sharpe*, the officers in this case did not simply stop defendant Brogden and fifteen minutes later return to question him or to place him under arrest. The officers stopped defendant Brogden and within minutes initiated questions appropriate to such an investigatory stop. The record reveals that in this case the questioning of defendant Brogden and the receipt of the information concerning the bill of lading occurred within fifteen minutes after the initial stop. *See*, Record, Vol. I, at 70–72; Vol. II, at 160–161. Thus, the officers had probable cause to make a lawful arrest within at least fifteen minutes after the initial stop. Probable cause in this case arose before defendant Brogden's detention transformed into the type of lengthy detention which was at issue in *Sharpe*.

■■■■■ Furthermore, this court is not persuaded that the statements made by defendant Brogden while he was detained in the patrol car with Officers Canady and Beach should be suppressed on Fifth Amendment grounds.[11] Defendant Brogden did not give these statements as a result of his being *interrogated* in a *custodial* setting.

■■■■ The United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), defined interrogation as "questioning initiated by law enforcement officers ...." *Id.* at 444, 86 S.Ct. at 1612. Read in isolation, this is a rather broad definition. As recognized in *Harryman v. Estelle*, 616 F.2d 870, 881 (5th Cir. 1980) (concurring opinion), the "majority of courts have recognized that the prescriptions and proscriptions of *Miranda* in light of the factual and historical background that the Court there considered, apply only to *investigative* questioning, aimed at eliciting evidence of a crime." Having considered the questions asked of defendant Brogden while he was detained in the patrol car, this court is not convinced that the questions are objectionable as being an interrogation. The questions [12] were preliminary in nature and did not concern the criminal activity of defendant Brogden.

■■■■■ The question of whether or not defendant Brogden was in custody when he made the statements deserves further analysis. Initially, it should be observed that the extent to which *Miranda* applies to vehicle stops "depends on whether these encounters reflect the type of inherently coercive tactics that may often attend a stationhouse interrogation." *United States v. Jim-*

---

11. Only defendant Brogden may properly make an objection here. No other defendants have standing to assert the alleged denial of defendant Brogden's right against self-incrimination. The right against self-incrimination is personal and may not be vicariously asserted. *See, United States v. Dowdy*, 486 F.2d 1042, 1043 (5th Cir. 1973); *Hall v. United States*, 413 F.2d 45, 48 (5th Cir. 1969).

12. Defendant Brogden was asked questions concerning why he was at Bennett's Point, where his truck was parked, when he had loaded out of Charleston, and why it took him two days to get where he was. Record, Vol. I, at 41.

*enez*, 602 F.2d 139 (7th Cir. 1979). *See, Harryman v. Estelle*, 616 F.2d 870, 881 (5th Cir. 1980) (concurring opinion). Upon considering the record as to what occurred during this incident, it is the opinion of this court that such coercive tactics were not present in the instant case. Officer Canady testified that he never held defendant Brogden at gunpoint, but merely kept a pistol in his hand until defendant Brogden got out of the Peterbilt tractor. He then placed the gun in his holster. Record, Vol. I, at 68, 70. Thus, no guns were displayed during the questioning. Such action was a reasonable and acceptable safety precaution for Officer Canady to take under the circumstances. Furthermore, this court does not conclude that the use of the patrol car to do the questioning was a coercive tactic. Officer Canady's request for Brogden to sit in the car because of the inclement weather was appropriate under the circumstances. In addition, neither Officer Canady nor Officer Beach in any way threatened defendant Brogden either physically or verbally. They never touched him, not even to frisk him. *See, Jimenez*, 602 F.2d at 144. Thus, this court finds that defendant Brogden's Fifth Amendment rights were not violated.

■ Finally, the officers' detection of an extremely strong odor of marijuana emanating from the rear of the trailer clearly raises no constitutional issues since no search occurred in detecting the odor and since the officers who smelled the odor had a right to be where they were at the time of the detection. *See generally, United States v. Haynie*, 637 F.2d 227 (4th Cir. 1980).

(2) *The Ford Tractor and Trailer.* Given the facts known to the officers after they seized the Peterbilt tractor and trailer and its driver, it is the finding of this court that probable cause existed to seize the Ford tractor and trailer and arrest its driver, Bohanan. The Ford tractor and trailer was observed coming from the same direction as the Peterbilt tractor and trailer had come. Additionally, the Ford tractor and trailer also had Georgia license plates and a "Polar Transport sticker" on its door, like the Pet-

erbilt tractor and trailer previously seized. Upon properly seizing the truck, Deputy Beach immediately noted the smell of marijuana coming from the trailer. No serious argument could be forwarded to attack the subsequent search of the Ford tractor and trailer since the record clearly shows that its driver, Bohanon, knowingly consented to a search of the trailer.

■ In light of the *Sharpe* case previously discussed, it is worthy to note here that the arresting officers actually needed only to show a "reasonable suspicion" of wrongdoing to justify their stop of the Ford tractor and trailer—not probable cause. The officers met both requirements imposed by the reasonable suspicion standard. They possessed a reasonable suspicion of illegality based on subjective belief and articulable, objective facts. *See, Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979). This suspicion was justified given all the facts which they knew, apart from any prior observations made as to the Peterbilt tractor and trailer. Secondly, the stop of the Ford tractor and trailer met the brevity requirement of the reasonable suspicion standard. *See, Sharpe*, at 969. Immediately upon making an investigatory stop of the Ford tractor and trailer, the officers detected the odor of marijuana emanating from the back of the trailer. Record, Vol. I, at 46. Given these observations, the officers had probable cause to seize the tractor and trailer and arrest driver Bohanon for violation of the drug laws.

(3) *The Brown Van and White "U–Haul Type" Truck.* During the suppression hearing, Officers Canady and Beach both testified that they observed, along with a tractor-trailer, a white "U–Haul type" truck and a brown van, both with Georgia license plates, parked at the Bennett's Point landing on the evening of November 26, 1980. They further testified that they observed these two vehicles in stalled traffic behind the tractor-trailers which had already been seized. The officers at the scene had reasonable suspicions at this point to make an investigatory stop of each vehicle. The of-

ficers, upon making such stops, detected the odor of marijuana on the drivers of the van and the "U–Haul type" truck. The officers had probable cause to arrest the drivers and occupants and seize the vehicles. The subsequent searches of the vehicles were performed pursuant to validly executed search warrants.

(4) *Abandoned Vehicle.* As previously stated, only the suppression of the lease agreement discovered during the warrantless search of the abandoned Chevrolet vehicle need be considered. Upon towing the abandoned vehicle to the yard of the jail at the Hampton County Sheriff's Department on November 28, 1980, the chief jailer made efforts to ascertain who was the registered owner of the vehicle. The jailer determined that the vehicle was registered to a division of Hertz located in Orlando, Florida. On December 3, 1980, pursuant to department policy, the Sheriff of Hampton County and an officer of the South Carolina Law Enforcement Division inventoried the vehicle. No warrant to make the search was obtained. At the time of the inventory, the Sheriff had information which led him to. suspect that the vehicle might be connected with the drug smuggling incident which had occurred a few days before at Bennett's Point. The testimony shows that in making the inventory, the officers apparently opened the unlocked glove compartment and found the Hertz rental agreement. Written on the agreement was the name of the lessor, James Hastings. Lieutenant Deer immediately recognized the name of the lessor to be the same name as one of the defendants in the Bennett's Point drug smuggling case. Record, Vol. VI, at 716–717.

In determining whether the lease should be suppressed, this court is aware of the numerous cases which have dealt with the issue of inventory searches of vehicles. In *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the United States Supreme Court recognized that "inventories pursuant to standard police procedures are reasonable." *Id.* at 371, 96 S.Ct. at 3098. The Court noted that it "consistently sustained police intrusions into automobiles impounded or otherwise in lawful policy custody where the process is aimed at securing or protecting the car and its contents." *Id.* at 373, 96 S.Ct. at 3099. The Court in *Opperman* significantly noted that there was no suggestion whatever that the procedure followed by the officers "was a pretext concealing an investigatory police motive." *Id.* at 376, 96 S.Ct. at 3100.

While there was testimony during the suppression hearing to the effect that the search was done for the purpose of protecting the property and its contents, this court is of the opinion that the search of the abandoned vehicle was in essence a warrantless *investigatory* search, and, as such, was an illegal search. In view of the fact that the officers performing the search entertained the suspicion that the abandoned vehicle was connected to the Bennett's Point drug case,[13] it can hardly be said that the search carried out by Sheriff Freeman and Lieutenant Deer arose in the "noncriminal context of inventory searches." *See, id.,* at 371, n.5, 96 S.Ct. at 3098. Moreover, this court is not persuaded to the contrary simply because "state" officials performed the search.[14] Having concluded that the search of the vehicle was an illegal one, it is the ruling of this court that

**13.** Lieutenant Deer testified to the following: "Deputy Youmans came to me and told me they had found an abandoned car at a boat landing in .... He felt like it might have some connection with the marijuana deal we had been working on." Record, Vol. V, at 548. On cross-examination, Officer Deer further testified as follows:

Q: Now, as part of your duties, you participated in the search of that vehicle for the express purpose of finding out whether or

not Mr. Youmans was correct; is that not true, sir?
A: Yes. I don't normally inventory.
Record, Vol. V, at 552.

**14.** It has been recognized that "the contact with vehicles by federal law enforcement officers usually, if not always, involves the detection or investigation of crimes unrelated to the operation of a vehicle." *Cady v. Dombrowski,* 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973).

the lease taken from the glove compartment should not be admissible in the trial of this case.[15]

(5) *The Shrimp Trawlers.* Fifteen of the twenty-three defendants remaining in this case were arrested aboard the two shrimp trawlers, the "Mary and John" and the "Lady Lisa." During the suppression hearing and in briefs subsequently filed with the court, the defendants argued that they were unlawfully arrested when they were ordered to follow the United States Customs vessel from St. Helena Sound to the Ashepoo River. They thus concluded that any evidence flowing from this alleged unlawful arrest would have to be suppressed.

■■■■■ Pursuant to their authority under Section 1581(a) of Title 19 of the United States Code,[16] the Customs officers properly hailed the two vessels in inland waters and proceeded to board. The stop of the vessels in inland waters under Section 1581 passes fourth amendment scrutiny if the Customs Officers had reasonable suspicion of a customs violation. *See, United States v. Watkins*, No. 80–5065, —— F.2d —— (4th Cir. November 5, 1981); *United States v. Serrano*, 607 F.2d 1145, 1148 (5th Cir. 1979), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); *United States v. Kleinschmidt*, 596 F.2d 133, 134 (5th Cir. 1979). It is the opinion of this court that the Customs officers had reasonable suspicion to believe that the vessels were involved in a drug smuggling operation upon their initial contact with the vessels. Customs Officer Shepherd testified that for the preceding two or three weeks he had observed no vessels in St. Helena Sound until he observed these vessels on the night of the arrests at Bennett's Point. The systems check which was run on the vessels immediately after approaching them indicated that the vessels might be involved in drug smuggling activities. In requesting the vessels to head for the Ashepoo for boarding because of the difficulty of boarding in the sound due to the weather, the Customs officers acted within their authority and with a view toward their safety.

The subsequent observations made by Customs after initial contact and before the vessels arrived in the Ashepoo provided the Customs officials with further justifiable suspicions concerning the trawlers and their crews. The manner in which the trawlers were maneuvered on their trip to the Ashepoo indicated their familiarity with the waters. The officers had earlier been told by the captain of the "Lady Lisa" that they were not familiar with the waters. Furthermore, no shrimping nets were observed on the trawlers when the trawlers were first approached by Customs, but upon arriving at Bennett's Point, the trawlers were observed to be completely rigged.

■■■■■ Once the officers were on board each trawler pursuant to their statutory authority, they properly took steps to ascertain whether all persons on board were accounted for. This was a justified safety precaution. *See, United States v. Alfrey*, 620 F.2d 551, 555 (5th Cir. 1980). At least by the time the officers discovered that the "Mary and John" crew was twice as large as its captain had told them, they had probable cause to make a more detailed search of that trawler. "If exigent circumstances be required, they were present as well. As the search was within statutory authority and was constitutional, its fruits . . . [are] admissible in evidence." *United States v. Whitmire*, 595 F.2d 1303, 1316 (5th Cir. 1979). The same ruling applies as to the

---

**15.** This ruling is made by the court after reconsideration of its order filed July 27, 1981, which denied all motions to suppress.

**16.** Title 19, Section 1581(a) provides:
Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized within a customs-enforcement area established under [sections 1701 and 1703–1711 of this title], or at any other authorized place without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

subsequent arrest of the crew. Furthermore, Officers Settles and Sheriden had probable cause to proceed with a search of the "Lady Lisa" upon observing the absence of fish or ice on the vessel and the freshly hosed down condition of the deck. The fruits of that search and the subsequent arrests are properly admissible into evidence.

### III. MOTIONS TO STRIKE

Numerous objections have been made by the defendants as to certain testimony presented during the suppression hearing. As in all suppression hearings, the rules of evidence did not bar any testimony at the suppression hearing.[17] Thus, all credible testimony was considered by this court in ruling on defendants' motions to suppress. In this case, the defendants, at the end of the suppression hearing, moved to adopt the suppression hearing record as the record of the trial of the case, subject to any objections subsequently filed with the court. It is these objections to testimony to be considered in the trial of the case which the court now focuses.

The testimony of Donald Bohanon[18] is objected to on the grounds that it was not credible, that it was "fruit of the poisonous tree," and that it constituted co-conspirator hearsay.

In criminal cases, defense counsel should be given great latitude in adducing proof which might bear on credibility. *United States v. Wolfson*, 437 F.2d 862, 874 (2d Cir. 1970). In this case, no such proof has been made. This court is not persuaded by the arguments of defendants that this court should find Bohanon's grand jury testimony to be incredible in light of his prior criminal record and his obvious desire to be a "good" government witness. Although this court was not present when Bohanon testified before the grand jury, it did observe him on the witness stand when he was called during the suppression hearing and found no reason to entertain concerns about his credibility at that time. Certainly, one of the useful functions of cross examination is to assist the fact-finder in appraising the credibility of a witness. *Wheeler v. United States*, 351 F.2d 946 (1st Cir. 1965). *See, Jennings v. United States*, 364 F.2d 513 (10th Cir. 1966), *cert. denied*, 385 U.S. 1030, 87 S.Ct. 760, 17 L.Ed.2d 677 (1966). By entering into the stipulation concerning Bohanon's testimony, the defendants relinquished their opportunity to vigorously cross-examine him so as to fully explore his credibility.

As has already been determined by this court's rulings in the preceding sections of this order, Bohanon's testimony should not be suppressed as the fruit of an illegal arrest, search and seizure, since there was

**17.** J. Shane Creamer, in his book, *The Law of Arrest, Search and Seizure* (3d ed. 1980), has succinctly discussed the anatomy of a Fourth Amendment suppression hearing:

Since there is no jury present at a suppression hearing, all of the traditional rules of evidence are jettisoned. This means that the rules of evidence such as the rule against the admission of prejudicial evidence and the Hearsay Rule do not bar any testimony at a suppression hearing. Everything is admissible. There are absolutely no restrictions on the kind of evidence that can come into a suppression hearing. There are no limitations as to the admissibility of testimony at a suppression hearing. The only necessity is that witnesses be placed under oath and that they tell the truth.

Since the normal protective evidentiary barriers are down at a suppression hearing and all evidence, hearsay or otherwise, is admissible, the judge, the prosecutor and the

defense lawyer, the three key figures at a suppression hearing, must be ever vigilant to assess the reliability of the evidence presented. This is true because the Fourth Amendment requires reliable, persuasive facts under oath to justify the use of police arrest, search and seizure powers.

**18.** The parties stipulated to the following:

It is hereby stipulated that the government's case in chief, by and between the government and defendants, that defendants will stipulate the statement of Bohannan [sic] before the Grand Jury, and Michaels, [sic] may be offered in lieu of their oral testimony as if each such witness had testified in open court under oath and then cross examined, and that that testimony would have been given by Bohannan [sic] and Michaels [sic] had they been so called to testify, ....
Record, Vol. X–A, at 239.

no violation of the Fourth Amendment which resulted in obtaining his testimony.

Defendants further object to Bohanon's testimony on the grounds that it constituted co-conspirator hearsay. *See,* Fed. R.Evid. 801(d)(2)(E). This court was provided with no specific objection as to what part of his testimony defendants objected to. Thus, this court finds it difficult to even consider this ground for their objection. However, upon consideration of the testimony, it is the opinion of the court that the government introduced sufficient independent evidence of the existence of the conspiracy and of all defendants' participation therein to support the admission of any hearsay declaration made by Bohanon. *See, United States v. Jackson,* 627 F.2d 1198, 1219 (D.C. Cir. 1980); *United States v. Dawson,* 576 F.2d 656 (5th Cir. 1978).

Defendants attack the testimony of Robert Charles Michael on the same grounds as they rely on to attack the testimony of Bohanon. No further consideration of this objection is warranted. The court's rulings as to the objections raised concerning Bohanon's testimony apply also to the objections raised concerning Michael's testimony.

The testimony of S.L.E.D. officer, Harold Trent Canady, is objected to by various defendants on the grounds that it lacks credibility. Upon review of the record and observation of the demeanor of the witness while he testified, this court concludes that Officer Canady's testimony is credible and trustworthy.

Defendants Thomas Manbeck, Herring, Sale, Proden, Summerville and Brogden argue that certain testimony of Officer Canady constitutes hearsay and should be stricken from the trial record. In making this argument, defendants' counsel provided this court with various page numbers from the record, but totally failed to provide the court with any guidance as to the specific testimony to which they objected.[19] It is doubtful that such a general objection complies with the Federal Rules of Evidence which state that error cannot be predicated on a ruling admitting evidence unless "a timely objection or motion to strike appears of record stating the *specific ground* of objection, if the specific ground was not apparent from the context . . . ." Fed.R. Evid. 103(a)(1). Surely, defendants' counsel at trial would not be allowed to raise a hearsay objection to groups of three to six questions, which is the number of questions appearing on the pages referred to by defendants' brief. Nevertheless, in pursuing defendants' hearsay objections and limiting scrutiny only to the pages of the transcript listed, this court finds that the hearsay statements of S.L.E.D. Officer Canady should be stricken from the record.[20]

The same hearsay objection has been raised as to testimony of Officers Beach and Fowler, and certain of this testimony should also be stricken from the trial record.[21]

Defendants O'Hare, Folske, Hightower, Laxton, Stevens, Lewis and Brantley have cited specific portions of the transcript which they object to on the grounds of hearsay. A review of the record indicates that certain portions of the testimony should, and is hereby, stricken from the record to be considered in the case in chief.[22]

---

**19.** Defendants' brief objects to "[a]ll hearsay statements of S.L.E.D. Officer Harold Trent Canady made during the suppression hearing, including those located at: (V. 1:34, 37, 38, 41, 43, 48, 50, 54, 60)."

**20.** The hearsay testimony to be stricken in volume I of the transcript follows: page 34, lines 8, 11, 12; page 37, lines 15–17; page 38, lines 4–6, 22–23; page 41, lines 7–8, 17–18, 20–24; page 43, lines 6–10, 22–23; page 48, lines 6–7; page 50, lines 15–17; page 54, lines 14–15, 24–25; and page 60, lines 15, 17–18, 23–24.

**21.** The hearsay testimony of Officer Beach to be stricken in volume II of the transcript is as follows: page 217, lines 11–13; page 225, lines 17–18; page 226, lines 17–18, 24–25; and page 229, lines 9–12, 17–19.

**22.** The following lines of the transcript are stricken pursuant to movants' hearsay objection: volume III, page 285, lines 23–25; volume III, page 86, lines 19–22; volume III, page 287, lines 15–19; volume III, page 303, lines 3–6; volume IV, page 443, lines 12, 13; volume IV, page 455, lines 7, 8; volume IV, page 456, line 25; volume IV, page 457, line 1; volume IV,

**1110**

These seven defendants further request that this court strike from the record to be considered in the case in chief certain testimony concerning an attempted bribery of the Sheriff of Colleton County and a deputy. These defendants argue that such testimony is irrelevant and prejudicial to the defendants in that such testimony makes it appear that the defendants were involved in a scheme to corrupt the sheriff.

The testimony to which these defendants object was elicited by some of the attorneys representing some of the defendants in an effort to lay a foundation for their clients to pursue the defense of entrapment. Record, Vol. VI, at 683. This defense was ultimately never relied on by any of the defendants. Having reviewed the record in its entirety, this court concludes that for the reasons set forth by the movants, this testimony should be, and is hereby, stricken from the record to be considered in the case in chief.[23]

Having reviewed the additional motions to strike raised by these seven defendants, it is the ruling of this court that they should be, and are hereby, denied.

Various defendants have objected to the admissibility of all testimony regarding any items seized from the abandoned Chevrolet vehicle. The government agreed to withdraw from evidence all items seized in the search of the vehicle, with the exception of the Hertz lease, and all testimony concerning the search, with the exception of the testimony of Sheriff James Freeman and Ida Ferguson, jail dispatcher. Record, Vol. VII, at 854–55. Having reviewed the record, it is the opinion of the court that the testimony of Deputy Freeman and Ms. Ferguson should remain in the trial record, with the exception of any testimony by the two witnesses concerning any items taken from the vehicle which were later withdrawn by the government.

Defendants also object to Government's Exhibit No. 6 for the case in chief which is a copy of the transcript of DEA Agent Harold Stein's testimony in a prior drug case. The transcript concerns the packaging of marijuana and Agent Stein's experience with Colombian marijuana. Defendants object to the admissibility of the prior testimony on the ground of improper foundation and irrelevance to the manner in which the marijuana allegedly seized in this case was packaged.

A review of the record indicates that the prior transcript testimony was stipulated into evidence as expert witness testimony for the case in chief, and that no defendant raised any objection to the testimony being so stipulated. Record, Vol. X–A, at 238–239. Thus, defendants' motion concerning this testimony is denied.

Defendants further object to statements made by one of the defense counsel and request that the statements not be considered in the trial of the case since his statements were not based on the facts as set out by the witnesses. The statements[24] at issue were a part of defense counsel's closing argument which covered facts which had never been presented to the court prior to his argument. While this court will not strike from the record this argument made during the proceedings, the statement at issue will not be considered by this court in determining the guilt or innocence of any of the defendants in this case. The verdicts handed down by this court are based on the evidence presented. In that regard, it should be noted that the incidence prema-

page 467, lines 23–25; volume IV, page 468, lines 19–20; volume IV, page 487, lines 8–13; volume V, page 548, lines 16–19; and volume VI, page 645, lines 20–21.

**23.** This testimony to be stricken includes that testimony found at volume VI of the transcript, page 676, line 17, through page 691, line 6.

**24.** The portion of the record at issue is as follows:

[Attorney]: There's not any question about the fact that the captain had a load of dope on his boat .... There was a half of load of dope on his boat that was dumped off in the Ashepoo River.
The Court: You keep telling me things that I don't know.
Record, Vol. X, at 27–28.

turely referred to by the attorney was fully covered in the statement of Robert Michael which was subsequently filed as evidence before the court the day following this argument. See, Government's Exhibit No. 7 (case in chief), at 16. That statement reveals that as the vessels followed Customs in to the landing, the crews began pitching bales of marijuana overboard, washing down the holds and drive shafts, throwing bleach down into the holds, picking out cracks and drains, and lifting the shrimp nets offdeck.

Defendants also object on Sixth Amendment grounds to any statements taken from any defendants by any members of law allegedly held at the Colleton County jail without being allowed to telephone a lawyer. They further object on the same grounds to Agent Thomas Sprague's testimony concerning any questioning at the jail of several of the defendants during this period.

▇ The law is clear that the government may not use in its case in chief incriminating statements obtained in violation of the defendant's right to counsel. Brewer v. Williams, 430 U.S. 387, 406, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977); Massiah v. United States, 377 U.S. 201, 206–207, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964). In this case, there is nothing in the record to lead this court to the conclusion that any of these statements were obtained in violation of that right. Agent Sprague testified that he carefully read the Miranda warning to the eleven defendants which he interviewed immediately upon their entry into the interrogation room. They then all agreed to a limited interview. Nothing in the record indicates that any of the eleven were in any way threatened, coerced, or intimidated or that any of them involuntarily or unknowingly gave any statements to Agent Sprague. Record, Vol. V, at 593–602. Defendants' motions based on Sixth Amendment grounds are thus denied.

**25.** Any matters concerning defendant Gary Gallopo will be dealt with in section IV of this opinion.

## IV. CASE IN CHIEF

Having ruled on defendants' motions to suppress, and having determined the content of the trial record, it becomes the duty of the court to rule on the guilt or innocence of the defendants [25] in this case.

The government has pursued three counts of the indictment against the defendants. As for Count 1, which charges the defendants with conspiracy to import marijuana into the District of South Carolina, the government has to prove the following essential elements beyond a reasonable doubt.

(1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to unlawfully import into the customs territory of the United States from any place outside thereof, or to import into the United States from any place outside thereof, marijuana;

(2) That each defendant willfully became a member of such conspiracy;

(3) That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods (or "overt acts") described in the indictment; and,

(4) That such "overt act" was knowingly committed at or about the time alleged in an effort to effect or accomplish some object or purpose of the conspiracy.

See, 21 U.S.C. §§ 952(a), 960 and 963. As for Count 2, which charges the defendants with conspiracy to possess marijuana, with intent to distribute, the government has to prove beyond a reasonable doubt that each defendant attempted or conspired to knowingly or intentionally possess marijuana with the intent to distribute it. See, 21 U.S.C. §§ 841(a)(1), 846. As for Count 3, which charges the defendants with importation of marijuana, the government must prove beyond a reasonable doubt that each defendant:

(1) contrary to the law, knowingly or intentionally imported marijuana; and/or

(2) aided, abetted, counseled, commanded, induced, or procured the knowing or intentional importation of marijuana, contrary to the law; and/or

(3) willfully caused the knowing or intentional importation of marijuana.

*See*, 18 U.S.C. § 2; 21 U.S.C. §§ 952(a) and 960.

■ The direct and circumstantial evidence establishes beyond a reasonable doubt the essential elements of the offenses charged in Counts 1, 2 and 3 of the indictment as to each of the defendants. Government witness Bohanon's testimony identified defendants Robert Manbeck, Thomas Manbeck, Brogden, Proden, Summerville and Herring as participants in the drug conspiracy. Government's Exhibit No. 8 (case in chief). Government witness Robert Charles Michael's statement identified Robert Manbeck, Thomas Manbeck, Sale, Hastings, Proden, Folske, Staetter, Scott, O'Hare, Laxton, Brogden, Summerville, Iyoob and Flannel as participants. Government's Exhibit No. 7 (case in chief). This testimony, which the court finds credible, combined with the additional evidence admitted by the court pursuant to its rulings on defendants' motions to suppress and motions to strike, leads this court to the inescapable conclusion that defendants, as charged in Counts 1, 2 and 3, violated the federal laws cited therein.

In finding the defendants guilty on Count 1 for conspiracy to import and on Count 3 for importation of marijuana, this court relies on the very recent opinion of the Fourth Circuit in *United States v. Seni*, 662 F.2d 277 (4th Cir. 1981). In *Seni*, the Fourth Circuit upheld defendants' conviction for conspiracy to import by primarily looking to evidence in the form of a navigational chart which was marked to show a journey outside the territorial waters of the United States. The chart had been found in the pilot house of the vessel seized. Similarly, in the case now before this court, the government, during the suppression hearing, introduced a navigational chart into evidence which had been discovered in the inventory of the "Lady Lisa." It was found in front of the steering wheel aboard the vessel and was marked so as to indicate a path of travel from far off shore in the Atlantic Ocean to the St. Helena area.[26] Record, vol. VI, at 739. From this, it could be reasonably concluded that the most recent journey made by the "Lady Lisa" was one involving importation. *Seni*, at 285. In addition, the expert opinion testimony of DEA Agent Stein,[27] which was stipulated into evidence, buttressed the government's proof of criminal importation in this case. His testimony indicated that he had been involved in every federal law enforcement smuggling case in the coastal counties of South Carolina since 1970. He testified that all the "water smuggling" cases since 1975 had involved marijuana shipped out of Colombia, South America. He based this determination on personal observation and on interviews of defendants, law enforcement officers, and informers. Government's Exhibit No. 6 (case in chief), at 387–388. While this expert testimony standing alone would perhaps be sufficient to prove criminal importation, *see, United States v. Watkins*, 662 F.2d 1090 (4th Cir. 1981), it certainly serves to buttress the government's proof so that this court is convinced beyond a reasonable doubt that criminal importation was involved in this case. Moreover, the circumstances of the apprehension of the defend-

**26.** The navigational chart was marked with ink dots and lines extending deep into customs waters. Customs waters are defined in 19 U.S.C. § 1401(j), as to an American vessel, as "the waters within four leagues [12 nautical miles] of the coast of the United States," and do not include inland waters inside the coastline.

**27.** The stipulation included the provision that Mr. Stein gave his testimony as an expert witness. Record, Vol. X–A, at 238. This situation is clearly distinguishable from the situation which arose in *United States v. Watkins*, 662 F.2d 1090 (4th Cir. 1981). In *Watkins*, the court ruled that similar testimony from Mr. Stein was lay testimony, since he did not qualify as an expert. The court ruled that such lay testimony, standing alone, was not sufficient to prove criminal importation.

ants supports the further conclusion that they all participated to some degree in the conspiracy to import marijuana into South Carolina.

As for the government's proof pursuant to Count 2, which charged the defendants with conspiracy to possess marijuana with intent to distribute, it was not necessary for the evidence to establish a conspiracy to obtain *actual* possession of the marijuana. Constructive possession was sufficient. *See, Watkins*, at 1097. "This exists when each defendant exercises, or has the power to exercise, dominion and control over the item. Additionally, possession of a large amount of marijuana among several people working together may be sufficient to show that each has constructive possession." *Id.* at 1097 (citations omitted). The totality of the evidence before this court establishes one continuous operation, mutually executed by all the defendants with the assistance of others, for transporting marijuana into South Carolina. Each defendant conspired to have the power to exercise dominion and control over the marijuana at some stage of the transaction. *See, id.* at 1098.

Having primarily considered the government's proof in this case from the standpoint of the applicable law, this court deems it useful to set forth the particular evidence as to the participation of each of the twenty-three named defendants.

### ROBERT JOHN MANBECK

Defendant Robert John Manbeck, who at the time of trial remained a fugitive, was named by Bohanon as the man who recruited him to drive a truck for the smuggling operation. Government's Exhibit No. 8 (case in chief), at 5. It is clear from Bohanon's testimony that Robert Manbeck was an organizer and overseer of the operation. The statement given by Robert Michael substantiates this conclusion. Government's Exhibit No. 7 (case in chief).

### THOMAS MANBECK

Defendant Thomas Manbeck was named by Bohanon as participating in activities and meetings on the night before and on the day of the operation. It can be inferred from Bohanon's testimony that Thomas Manbeck was one of the participants who was in charge of much of the project. Michael's statement indicates that Thomas Manbeck, at one point, handed out money to certain other of the defendants to take care of their expenses. Government's Exhibit No. 7 (case in chief), at 5. Michael stated that the plan called for Thomas to leave the landing after the marijuana was loaded with one of the trucks. *Id.* at 9.

### KENNETH HERRING

Bohanon identified defendant Kenneth Herring as one of the defendants who on November 20, 1980, left in the convoy from Georgia to South Carolina to carry out the smuggling operation. On the day of the operation, according to Bohanon, Herring was involved in meetings at a motel where they all were staying, with himself, Robert Manbeck and Thomas Manbeck. Bohanon identified defendant Herring as the "gentleman involved who had the money and everything; who helped finance this and who also gave me money." Government's Exhibit No. 8 (case in chief), at 11. He was also in charge of familiarizing some of the other participants in the operation with the route that was to be taken to the Bennett's Point landing on the evening of the offloading. *Id.* at 19, 21.

### MARK HUIET SALE

Defendant Sale was frequently mentioned in the Michael statement as assisting with the project during the days before the evening of the offloading. At the landing on that evening, Sale assisted by throwing the bales of marijuana placed on conveyor belts to the nearby trucks. Government's Exhibit No. 7 (case in chief), at 11. He was subsequently arrested driving the brown van involved in the operation.

### DAVID MARTIN SUMMERVILLE

Concerning defendant Summerville, Bohanon testified: "Somewhere down the line he was involved with the money. I don't

think he put up the money directly, but somebody he knew had put up some money." Government's Exhibit No. 8 (case in chief), at 11. Bohanon testified that defendant Summerville drove an eight wheeler used in previous deals from Florida to South Carolina so that it could be used in the operation. *Id.* at 45. He also participated in various meetings with his co-defendants. Defendant Summerville was arrested on the evening of the operation driving the white "U-Haul type" truck.

## LORENZ JOSEPHUS PRODEN

Proden, according to Bohanon, was involved in the planning of the operation, and was involved in the convoy which proceeded from Atlanta to South Carolina. Government's Exhibit No. 8 (case in chief), at 11. He was also involved in various meetings prior to the actual operation. He was also identified by Michael as the person in charge of setting up the conveyors at the offload site. Government's Exhibit No. 7 (case in chief), at 9. According to Michael, Proden assisted the offloading by parking the trucks so as to place as much of the marijuana on each vehicle as possible. *Id.* at 12. Defendant Proden was arrested with defendant Mark Sale in the brown van involved in the operation.

## KERMIT THEODORE BROGDEN

Defendant Brogden was named as one who worked for Robert Manbeck. Government's Exhibit No. 7 (case in chief), at 9. He drove a tractor-trailer from Georgia carrying electric conveyors and parked it at the offload site on the night in question. *Id.* at 8, 9. These were used to move the bales of marijuana from the "Mary and John" and the "Lady Lisa" to the land vehicles. He clearly participated at the planning stage of the operation. Government's Exhibit No. 8 (case in chief), at 10, 20, 21. At one point, he purchased tires for Bohanon's truck with money given to him by Robert Manbeck. *Id.* at 25. Defendant Brogden was arrested driving one of the tractor-trailers seized on the road out from the Bennett's Point landing.

## JOHN O'HARE, EDDIE BRANTLEY, THOMAS SAMS HIGHTOWER, HARREL LEWIS, JR., JOHN ISIDORE STEVENS, JOHN BENJAMIN BARTON, JR., JOHN WESLEY FLANNEL, JESSE LEE MALLORY, AND ARTHUR DUNCAN

Defendant John O'Hare was named as one of the offloaders. Government's Exhibit No. 7 (case in chief), at 11. He was arrested by Customs officers on board the "Lady Lisa" at the landing on the night in question. Defendants Brantley, Hightower, Lewis and Stevens were also arrested on board the "Lady Lisa". Defendant Flannel, the boat captain, and defendants Barton, Mallory and Duncan were arrested on board the "Mary and John."

## THOMAS EARNEST FOLSKE

Defendant Folske was identified as one who rode with Michael and defendants Proden, O'Hare, Scott, Staetter and Sale in the brown van down to the dock on the evening of the offload. Inside the fish house, he made preparations for the offloading. Government's Exhibit No. 7 (case in chief), at 7–8. He thereafter assisted with the actual offloading. *Id.* at 11. Defendant Folske was subsequently arrested on board the "Lady Lisa."

## TIMOTHY ALAN LAXTON

Defendant Laxton was identified as the "head man of the offload people." Government's Exhibit No. 7 (case in chief), at 8. He, along with defendant Folske, made preparations in the fish house for the offloading. *Id.* He also assisted in the actual offloading. *Id.* at 11. Defendant Laxton was arrested on board the "Lady Lisa."

## AARON DOUGLAS STAETTER

Defendant Staetter checked the brown van with an electronic detector before getting in it to ride with the others to the offload site. Government's Exhibit No. 7 (case in chief), at 7. During the actual offloading, defendant Staetter positioned

himself on the dock. *Id.* at 11. He was subsequently arrested on board the "Mary and John." Thereafter, a wallet containing defendant Staetter's identification was discovered in the search of the brown van.

## JOHN MICHAEL IYOOB

Defendant Iyoob arrived at the landing that evening on board the "Mary and John." He assisted in offloading the vessels and left the landing on one of the vessels. Government's Exhibit No. 7 (case in chief), at 12, 15. He was arrested on board the "Mary and John."

## JAMES ANTHONY HASTINGS

The record shows defendant Hastings to have been one of the participants clearly in charge of much of the operation. He informed all participants that the operation had been called off for the evening of November 25, 1980. Government's Exhibit No. 7 (case in chief), at 5. During the actual offloading, he was "all over the place watching, giving orders." *Id.* at 11. When the offloading was suddenly cut short, defendant Hastings jumped on board one of the departing vessels and pulled out a large sum of money. He split some of the money with those on board and attempted to throw some of it away. He further informed those on board the vessel on which he was departing that they needed to get away because they had several other places to offload the next day. *Id.* at 16. Defendant Hastings was thereafter arrested on board the "Mary and John."

## GREGORY MICHAEL SCOTT

Defendant Scott was identified as one of the individuals who arrived at the offload site in the brown van. Government's Exhibit No. 7 (case in chief), at 7. He was identified as working for Hastings and was in charge of counting the bales as they came off the boat. *Id.* at 11. He was arrested on board the "Mary and John."

## V. DEFENDANT GARY GALLOPO

The government's case against defendant Gary Gallopo was of a different nature from the case brought against the other twenty-one defendants who were arrested. After the arrests of the other defendants were made, the government provided Donald Bohanon with immunity from prosecution and he agreed to assist the government and to testify before the grand jury and as a government witness at the trial of this case. In light of Bohanon's grand jury testimony, Gary Gallopo was identified as another participant in the drug smuggling case. He was subsequently arrested and charged along with the other defendants.

As for all matters raised during the suppression hearing, defendant Gallopo claimed no standing to object to any items introduced into evidence. Record, Vol. (March 26, 1981), at 224. Nothing was offered on behalf of defendant Gallopo during the suppression hearing. Record, Vol. (March 26, 1981), at 163. At the beginning of the trial of defendant Gallopo, both parties agreed to adopt the record of the suppression hearing into the trial record with the exception of the testimony of Bohanon and the statement of Michael.[28] Record, Vol. (March 26, 1981), at 224–45, and Record, Vol. X, at 138–39. Defendant Gallopo filed no motions to strike testimony from the record.

During the suppression hearing, the government introduced into evidence government's Exhibit No. 24, a red pad taken from the brown van involved in the smuggling operation. That pad included an entry which read "Gary Gallopo." Immediately under that entry is the entry "HJ 101."

The trial began with the government calling Bohanon as its first witness. Bohanon testified in detail to the activities which resulted in the attempt to smuggle marijuana in to Bennett's Point landing on the

---

28. Any references during the trial of defendant Gallopo to the involvement of the other defendants in the smuggling operation were stricken from the record and in no way are considered by this court in determining any issues as to those other defendants. Record, Vol. X–A, at 243.

evening of November 28, 1980. Bohanon named defendant Gallopo as the driver of a Kenworth "conventional eighteen-wheeler" which was involved in the operation and testified that he had never heard of or met Gallopo before that evening at Bennett's Point landing. Bohanon was at first unable to make any in-court identification of Gallopo, but later pointed to defendant Gallopo as the man he had met at Bennett's Point. He noted to the court that he could not be positive of the identification. Record, Vol. (March 26, 1981), at 274–75, 282–83. Bohanon testified that he met Gallopo and accompanied him into the shrimp house at the landing, where they stayed for about an hour with about ten of the other defendants waiting for the vessels to come. Bohanon testified that Gallopo got his tractor-trailer "in position" before Bohanon left the scene with a load of marijuana, but that after leaving the scene, he did not know what had happened to Gallopo. Upon having his memory refreshed, Bohanon testified that he told the grand jury that he never knew the name of the driver of the third tractor-trailer up to the date on which he testified before the grand jury. Record, Vol. (March 26, 1981), at 301.

Robert Michael also testified at length concerning the events leading up to the arrests at Bennett's Point. He positively identified defendant Gallopo as the driver of the third tractor-trailer loaded at Bennett's Point that evening, although he admitted not knowing him by name. Record, Vol. (March 26, 1981), at 347–48. He testified that he and the individual driving the third tractor-trailer went in the fish house on the landing to get out of the weather and to dry off and stayed inside for about fifteen minutes.

After the court denied defendant Gallopo's motion for a judgment of acquittal, the defendant entered certain stipulated testimony into evidence.[29] This testimony and certain other exhibits and testimony were submitted into evidence by defendant Gallopo in support of what was referred to during the proceedings as the "truck alibi defense." Record, Vol. (June 4, 1981), at 45–56. Defendant Gallopo agreed that he in fact was present in the Walterboro area on the day in question driving a tractor-trailer loaded with oranges, but contended that he was totally innocent of any wrongdoing. He presented testimony to show that he was hauling his load of oranges from Florida up North and experienced problems with his refrigeration unit, requiring him to stay at the Howard Johnson Motel[30] in Walterboro on November 24th, 25th and 26th until he could be picked up by another truck driver.

Having considered the record, this court has no difficulty in concluding that the government has proven its case against defendant Gary Gallopo beyond a reasonable doubt. The testimony of both Bohanon and Michael was sufficient to identify defendant Gallopo as a willing participant in the drug smuggling conspiracy which is the subject of this case. The evidence was sufficient to show defendant Gallopo in close proximity to the other smugglers during the period in question. The evidence further indicates he had contact with at least one of the co-conspirators so that the notation in the red pad was made possible. Moreover, the evidence is sufficient to place defendant Gallopo at the offload site on the evening of November 26, 1980, and to show his participation in the scheme as the driver of the third tractor-trailer which managed to escape from the area that evening. Thus, as for all four counts of the indictment, the government has proven its case against defendant Gallopo beyond a reasonable doubt.[31]

**29.** This stipulated testimony consisted of Gallopo's Exhibits No. 2 (testimony of Timmy G. Marsh), No. 3 (interview with Sue Hess), No. 4 (testimony of Janice Jones), No. 5 (testimony of Solomon Williams), No. 6 (testimony of Andy Gibbons), and No. 7 (interview with Ronald Headden).

**30.** Gallopo's Exhibit No. 9 indicates that he was registered to Room 101.

**31.** As for Counts 1, 2 and 3, the court has previously set forth the essential elements which the government had to prove beyond a reasonable doubt. As for Count 4 of the indictment which charged defendant Gallopo with

## VI. VERDICTS

Accordingly, it is the verdict of this court that defendants Thomas Manbeck, Kenneth Herring, Mark Huiet Sale, David Martin Summerville, Lorenz Josephus Proden, Kermit Theodore Brogden, John O'Hare, Eddie Brantley, Thomas Earnest Folske, Thomas Sams Hightower, Timothy Alan Laxton, Harrel Lewis, Jr., John Isidore Stevens, Aaron Douglas Staetter, John Michael Iyoob, James Anthony Hastings, John Benjamin Barton, Jr., John Wesley Flannel, Jessie Lee Mallory, Arthur Duncan and Gregory Michael Scott, are hereby guilty of the offenses charged in Counts 1, 2, and 3 of Indictment # 80–278. These defendants' motions for judgment of acquittal are hereby denied.

It is hereby the verdict of this court that defendant Gary Gallopo is guilty of the offense charged in Counts 1, 2, 3 and 4 of Indictment # 80–278. Defendant's motion for judgment of acquittal is hereby denied.

The Clerk shall enter a verdict of guilty as to each of the above-named defendants and serve a copy of this order on all defendants and their attorneys of record.

It is the further order of this court that all defendants shall remain on their same bond.

Judgment and sentence shall be pronounced at 10:00 a. m., February 1, 1982, in the Courtroom, United States Court House, Charleston, South Carolina, unless otherwise ordered. Defendants here involved, and counsel shall be present.

Each defendant shall contact the United States Probation Office, Charleston, South Carolina, on or before December 2, 1981.

AND IT IS SO ORDERED.

possession with intent to distribute marijuana, the government had to prove the following elements beyond a reasonable doubt:

   (1) that the defendant knowingly and willfully possessed marijuana as charged; and

   (2) that he possessed the substance with the intent to distribute it.

*See,* 21 U.S.C. § 841(a)(1). Count 4 also charged 18 U.S.C. § 2 (aiding and abetting).