UNITED STATES of America, Appellee,

v.

Frank Ashbell TATE, Appellant.

No. 79–5044.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 10, 1980.

Decided May 8, 1981.

**940**

Kenneth L. Foran, Alexandria, Va., for appellant.

Justin W. Williams, U. S. Atty., Alexandria, Va. (R. S. Powell, Third Year Law Student, on brief), for appellee.

Before FIELD, Senior Circuit Judge, and WIDENER and SPROUSE, Circuit Judges.

WIDENER, Circuit Judge:

This is an appeal from a criminal conviction in which the defendant contests the admission of evidence discovered as the result of an investigatory stop by police officers. We affirm.

On the afternoon of September 29, 1977, Officers Hubbard and Lee, detectives assigned to the drug task force of the Washington, D. C. Metropolitan Police Department, were patrolling the vicinity of the Thirteen Hundred block of T Street, N.W., in the District of Columbia in an unmarked vehicle. This was the principal location of street narcotics activity in the city. At about 2:30 p. m., Lee noticed a red Chevrolet Monte Carlo with Pennsylvania license plates occupied by the defendant, Frank Ashbell Tate, and a female passenger, Doris P. Tillman, parked alongside 1343 T Street. One or more men standing on the sidewalk by the car were talking with Tate and Miss Tillman. Detective Lee believed one of the men on the sidewalk to be Milton Glover, to Lee known to be a narcotics dealer.[1] Also taking part in the conversation was Thomas Joseph Smith, another narcotics dealer known to Lee, as well as other narcotics violators.

As Lee noticed the man he thought to be Milton Glover looking up, Tate slowly drove the Monte Carlo on T Street toward the intersection of Thirteenth and T Streets. At that point, T Street is a narrow, two-lane, one-way thoroughfare through a residential area. People milling about the sidewalk and street had their customary effect of impeding traffic. Tate halted in front of 1315 T Street, and a brief conversation ensued with another man. Tate then drove to the intersection of Thirteenth and T Streets, where he stopped for a red light.

1. Lee insisted throughout the case that one of the men on the sidewalk whom he saw talking to Tate was Milton Glover, a known narcotics dealer. There is some doubt about this, however, for the government at one point stipulated that Glover was in jail at that time. Nevertheless, there is no doubt that Lee believed one of the men was Glover. More importantly, it is uncontradicted that one other man on the sidewalk recognized by Lee was Thomas Joseph Smith, who was known to Lee to be a narcotics dealer. As well, it is uncontradicted that other narcotics violators were also present when Tate was talking to the man thought to be Glover and the man known to be Smith.

The detectives pulled the unmarked but readily identifiable police cruiser alongside Tate's car stopped at the red light. Tate and his companion appeared to be hiding their faces from the gaze of the officers. Displaying his badge, Lee identified himself as a police officer and ordered defendant to pull around the corner and stop after the change of the light, which Tate did. At this time, Lee was looking for one Michael Taylor, a fugitive from a Philadelphia, Pennsylvania narcotics conspiracy charge. Either Lee or Hubbard, by radio, requested a check on the Monte Carlo's license number. The officers parked immediately behind Tate. Hubbard got out of the car and walked up to the Monte Carlo. He requested a driver's license and registration from Tate. Tate displayed his District of Columbia license but could not produce any registration for the Monte Carlo. Detective Lee alighted from the police cruiser and requested Hubbard to return to the car to await a response to their call requesting a license number check. Within one or two minutes after the detectives had radioed requesting a vehicle license check, they received a response reporting that the Monte Carlo was listed as stolen. The detectives then placed Tate and his female companion under arrest for unauthorized use of the vehicle.

Attendant to the arrest, Detective Lee seized certain items of evidence in plain view in the Monte Carlo. These items included checks in different names, computer printouts, and items of personal identification, also in various names. A search of Tate's person uncovered an altered driver's permit, other identification, and a check. Some or all of these items were admitted in evidence at the defendant's trial.

On November 15, 1978, a jury found Tate guilty on eight counts of transporting forged securities in interstate commerce, one count of interstate transportation of a stolen motor vehicle, and one count of using and transporting property in interstate commerce obtained with a stolen credit card.

Prior to trial, a motion to suppress the items taken from Tate's person and the Monte Carlo was denied. The principal emphasis in this appeal is the validity under the Fourth Amendment of the investigatory stop by Detectives Hubbard and Lee, as a result of which the arrest and subsequent seizure of the documents occurred.

■ The order by Detectives Hubbard and Lee to defendant to turn the corner and pull his automobile over to the curb so that the detectives could check his driver's license and registration was a seizure within the meaning of the Fourth Amendment. See *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *United States v. Cortez*, — U.S. —, —, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Under the Fourth Amendment, the validity of this investigatory stop depends upon a balancing of the intrusion on the defendant's Fourth Amendment rights against the prosecution of legitimate governmental interests sought to be accomplished by the actions of the detectives. *Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396. The reasonableness standard imposed by the Fourth Amendment requires that the facts on which Detectives Hubbard and Lee based their decision to stop the defendant's vehicle "be capable of measurement against an 'objective standard.'" *Prouse* at 654, 99 S.Ct. at 1396.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court established the principle that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Adams*, 407 U.S. at 145, 92 S.Ct. at 1922, quoting *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880. For purposes of judging its reasonableness under the Fourth Amendment, the investigatory stop to check Tate's driver's license and registration should be analogized to the on-the-street encounter in *Terry*. See *Prouse*, 440 U.S. at 655–57, 662–63, 99 S.Ct. at 1396–97,

1401–02, which explains the similarity between a roving-patrol stop in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and a stop to check driver's license and registration. *Brignoni-Ponce* analogized a roving-patrol stop of any vehicle at random to a *Terry* stop. *Prouse*, 440 U.S. at 655, 99 S.Ct. at 1396, *Brignoni-Ponce*, 422 U.S. at 878–82, 95 S.Ct. at 2578–80. The detectives' stop of the Monte Carlo to check Tate's driver's license and registration is reasonable under the Fourth Amendment if the facts known to Detective Lee justify an "articulable and reasonable suspicion that" Tate was "subject to seizure for violation of law" *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1402.

We think that the objective circumstances observed by and known to Detective Lee render his suspicion that the defendant was Michael Taylor, the narcotics conspiracy fugitive from Philadelphia, Pennsylvania, "articulable and reasonable."[2] *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1402. The objective circumstances were that the Monte Carlo driven by Tate had Pennsylvania license plates; the fugitive sought was from a Pennsylvania narcotics conspiracy charge; the defendant was driving along and stopping in the 1300 block of T Street, N.W., the principal location of narcotics activity in Washington, D.C.; a man thought by Detective Lee to be Milton Glover, a known narcotics dealer, and another known to be Thomas Joseph Smith, another known narcotics dealer, as well as other narcotics violators were observed talking to Tate; and the defendant and his companion appeared to be hiding their faces from the view of the detectives.

■ Viewed in isolation, it may be argued that neither the conversation of the occupants of the Monte Carlo with men believed or known to be drug peddlers and narcotics violators nor the defendant's presence in an area infested with illegal narcot-

ics activity would justify the investigatory stop. See *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979), (presence in neighborhood frequented by drug users, standing alone, not basis for concluding defendant was engaged in criminal conduct); *Sibron v. New York*, 392 U.S. 40, 62–64, 88 S.Ct. 1889, 1902–1903, 20 L.Ed.2d 917 (1968) (mere act of talking with number of known narcotics addicts over eight-hour period does not justify weapons frisk); but see *Brignoni-Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–82 (proximity to border a factor to take into account in determining reasonable suspicion to stop car in border area). But when all the facts are examined through the eyes of a narcotics detective with seventeen years' experience on the police force, the activities of the defendant can take on a less innocent hue. See *Terry*, 392 U.S. at 22–23, 88 S.Ct. at 1880–1881. The conversation; the defendant's presence in an area rife with illegal narcotics activity; the search for a Pennsylvania narcotics fugitive; the Pennsylvania tags on the Monte Carlo; and Tate and his female companion appearing to attempt to hide their faces amount to an "articulable and reasonable" suspicion that the defendant was the Pennsylvania narcotics fugitive sought. See *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1402.

Having perceived these suspicious circumstances, the detectives were not obliged to "shrug their shoulders" and watch the defendant drive away because they may have lacked probable cause to arrest him. See *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972). It was perfectly proper for the detectives to "maintain the status quo" by briefly stopping the defendant to check his driver's license and registration while awaiting more information in the form of a response to their request for a vehicle license check. *Id.* at 146, 92 S.Ct. at 1923. As an alterna-

---

2. An investigatory stop by the detectives might also have been justified under Lee's belief that Tate and his companion were picking up or dropping off narcotics. We have no need to, however, and do not, examine that question in detail since we believe it obvious that the de- tectives had a right to stop the car in searching for the fugitive. We thus express no opinion on the question of whether or not the stop was justified because of suspicion of violations of the narcotics laws.

tive to formal arrest or complete inaction, we find the stop to be "the essence of good police work"; an "intermediate response" reasonably related in scope to the justification for its initiation. See *Adams*, 407 U.S. at 145, 92 S.Ct. at 1922.

There can be no question that the detectives had probable cause to arrest the defendant when the response to their request for a license check reported that the Monte Carlo was listed as stolen. There was no need for a warrant since the detectives arrested the defendant for a felony in a public place. *United States v. Watson*, 423 U.S. 411, 418, 423–24, 96 S.Ct. 820, 825, 827–28, 46 L.Ed.2d 598 (1976). Therefore, the search of the defendant's person incident to the arrest was reasonable. *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 472, 38 L.Ed.2d 427 (1973). Likewise, the seizure of evidence from the Monte Carlo was proper because the items seized were in plain view. *United States v. Sifuentes*, 504 F.2d 845, 848–49 (4th Cir. 1974).

We have examined the defendant's other contentions and find them to be without merit.

The judgment of the district court is accordingly

*AFFIRMED.*